UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

U.S. DISTRICT COURT
DISTRICT OF N.H.
FILED

2009 APR 24 P 1: 05

NANCY GEMBITSKY
 Plaintiff

 v.

THOMAS F. DESTEPH;
THE DESTEPH AGENCY; and
TDA ADVANTAGE TRUST
 Defendants

PEOPLES UNITED BANK,
d/b/a OCEAN BANK,
 Trustee Defendant

*1: 09-cv-140-JM*

VERIFIED *EX PARTE* PETITION FOR
PRE-JUDGMENT ATTACHMENT WITHOUT NOTICE

Plaintiff Nancy Gembitsky moves, pursuant to Fed. R. Civ. P. 64(a) and RSA 511-A:8,

for permission to make the following attachments without prior notice to defendants:

| Name of Defendants | Category Of Property To Be Attached | | Amount |
|---|---|---|---|
| | Real Estate | Other | |
| THOMAS F. DESTEPH | YES | For all three defendants:<br>-Any and all motor vehicles and boats; | $250,000 |
| THE DESTEPH AGENCY | YES | -Any and all accounts receivable;<br>-Any and all contractual rights to payments; | $250,000 |
| TDA ADVANTAGE TRUST | YES | -Any and all securities representing debt or equity interests in any corporation, limited liability company, partnership, limited partnership or other entity;<br>-Any and all checking accounts, savings accounts, certificates of deposit and other bank deposits;<br>-Any and all annuities;<br>-Any and all promissory notes, bonds, indentures, and debentures;<br>**(Any or all of the above to be secured, if necessary by supplemental motions for trustee process)** | $250,000 |
| Peoples United Bank d/b/a Ocean Bank **Trustee Defendant** | N/A | All cash deposits in bank accounts belonging to defendants (a) Thomas F. DeSteph; (b) The DeSteph Agency; or (c) TDA Advantage Trust | $250,000 |

**A. In support of this Petition for an Attachment Without Notice, the Plaintiff certifies the following facts to establish probable cause of the right to recover, and the amount thereof:**

I. Background Facts

1. In the fall of 2002, plaintiff Nancy Gembitsky was employed in the human resources department of CIGNA Healthcare in Connecticut.

2. Around that time, she inherited approximately $100,000 from her deceased mother's estate. This represented the only retirement savings that she had with the exception of her 401(k) accounts.

3. A colleague at CIGNA, Gail Riggins, told Ms. Gembitsky that defendant Thomas DeSteph might be able to help her invest her life savings and retirement funds. Riggins said that she purchased insurance and investments through DeSteph. She also told Ms. Gembitsky that, although DeSteph lived in New Hampshire, he frequently visited Connecticut because he had grown children there from his first wife, who also worked at Cigna. According to Riggins, DeSteph would meet with her and other Connecticut clients in their homes while he was visiting family.

4. Based on this recommendation, Ms. Gembitsky gave Riggins permission to pass her contact information on to defendant DeSteph.

5. Defendant DeSteph called Ms. Gembitsky in or about October, 2002. He introduced himself and offered to meet Ms. Gembitsky for dinner to discuss her investment needs. A meeting was arranged and he picked Ms. Gembitsky up at her house and brought her to a restaurant for a dinner business meeting.

2

6. At the dinner meeting described above, the two discussed Ms. Gembitsky's finances as well as defendant DeSteph's personal situation—He was divorced from his second wife and he was seeking custody of his two young children. Although Gembitsky continually tried to re-focus the conversation on her investment needs, DeSteph mixed personal and business issues in his conversation throughout the evening. He stated that he needed to "vent" and he believed that because Gembitsky had a counseling background she could give him some advice.

7. The dinner meeting ended with DeSteph stating that he wanted to see Ms. Gembitsky's financial paperwork. They agreed that he would look through the documents at Ms. Gembitsky's residence.

8. Either at the dinner meeting or during the previous phone call, DeSteph represented himself as the principle of defendant The DeSteph Agency. The DeSteph Agency markets itself as an insurance and financial planner. Its website claims that it "uses innovative financial and insurance solutions that have pleased the most discerning clients." See, www. desteph.com. It claims to be proficient in arranging or brokering such investments as tax deferred annuities, IRAs, long term care insurance polices, life insurance and group benefits. Id.

9. Prior to arranging a second face-to-face business meeting, DeSteph sent Ms. Gembitsky an email inviting her to come to his residence in New Hampshire to meet his young children. Ms. Gembitsky declined, stating in an email that this would be inappropriate because they only had a business relationship and she did not want to involve DeSteph's children.

10. A few weeks later, DeSteph visited Ms. Gembitsky at her residence, pursuant to an appointment to review her financial paperwork, in the presence of Ms. Gembitsky and her brother. During his time in the residence, DeSteph once again mixed business and personal

issues together. Ms. Gembitsky believed that DeSteph was interested in both a business and a social relationship.

11. Following, his review of Ms. Gembitsky's paperwork, defendant DeSteph individually and d/b/a The DeSteph Agency advised Ms. Gembitsky to roll her 401(k) funds over into tax deferred annuities issued by AIG and Allianz. Ms. Gembitsky agreed to do this and, on or about December 5, 2002, DeSteph presented her with paperwork to accomplish the transactions.

12. These transactions (involving the transfer of 401(k) funds to annuities issued by AIG and Allianz) were, on information and belief, completely legitimate. Ms. Gembitsky started receiving statements from AIG and Allianz in a timely fashion and she still receives statements from those issuers.

13. However, after DeSteph brokered these transactions, he continued to contact Ms. Gembitsky for various purposes. He called Ms. Gembitsky several times when he was in Connecticut. They went to dinner at area restaurants several times where they discussed mainly personal issues. Ms. Gembitsky would talk about her financial issues. Mr. DeSteph would speak about his ongoing custody disputes with his ex-wife and his young girls. Once, he called Ms. Gembitsky to see if she would let him drop the children off at her house for a couple of hours, which she did. That night he stayed in Ms. Gembitsky's house, along with his children, Ms. Gembitsky and her brother. On two or three other occasions, DeSteph stayed with Ms. Gembitsky and her brother when he was traveling in Connecticut. In between visits he would call Ms. Gembitsky to speak about the same topics of conversation.

14. DeSteph also attempted to enlist Ms. Gembitsky as a witness in his custody case. He wanted her to sign an affidavit stating that his ex-wife was a bad parent, which Ms. Gembitsky

4

refused to do based on her lack of knowledge. Ms. Gembitsky did write a letter stating that the girls smelled of cigarette smoke and claimed their mother smoked a lot.

15. Around Christmastime, 2002, DeSteph invited Ms. Gembitsky to his residence in New Hampshire for a holiday dinner with his children. He claimed that his children liked her and missed having a holiday dinner with his family. Ms. Gembitsky spent the night on DeSteph's couch.

16. At this holiday dinner, DeSteph told his young children—to Ms. Gembitsky's great surprise—that they all would be going to Disney World in Florida, including Ms. Gembitsky. Ms. Gembitsky demurred, stating that she would not be going. However, in the ensuing days and weeks, DeSteph continued to tell his children that Ms. Gembitsky would travel with them to Florida. DeSteph told Ms. Gembitsky that he needed somebody to help him out with the two girls and Ms Gembitsky thought he needed a nanny for the trip.

17. Against her better judgment, Ms. Gembitsky went with DeSteph to Florida, sleeping on a couch and taking care of the children during the day. DeSteph paid for her transportation and hotel, but Ms. Gembitsky paid for all of her other expenses.

18. Ms. Gembitsky terminated her social relationship with DeSteph after the trip to Disney World. At no point did Gembitsky have an intimate or even romantic relationship with DeSteph. Indeed, Gembitsky noted that DeSteph never made any sort of "advance" on her and she never thought he was interested in a romantic or physical relationship. She believed that he thought she was a good influence on his children. In any event, after the Florida trip, Ms. Gembitsky thought that the social relationship had to end.

5

II. The $100,000 Transfer

19. Sometime after the Christmastime dinner in December, 2002, and before the trip to Disney World, DeSteph began promoting a "investment opportunity" to Ms. Gembitsky. He informed her that he and The DeSteph Agency had an investment that "only special people were invited to participate in" and that he was personally inviting her participation.

20. Ms. Gembitsky asked for additional information about this special, invitation-only investment. Defendant DeSteph responded by stating that the Howard Financial Company in West Hartford, where DeSteph had friends, also did these investments for "special" clients. He also told Ms. Gembitsky that he had done these investments in the past with other "special" clients and that he would like the plaintiff to participate.

21. Ms. Gembitsky pressed defendant DeSteph for additional information. DeSteph became upset and said that he was being "generous" to invite her into the investment and that she "shouldn't look a gift horse in the mouth," or words to this effect. DeSteph told Ms. Gembitsky that he trusted her with his children and that she should trust him with this investment. Ms. Gembitsky did not accept the invitation to invest at this time.

22. A few weeks later, DeSteph contacted Ms. Gembitsky and asked her where she was considering putting the money from her inheritance. She told him that she was thinking about a CD at that time. DeSteph informed her that she would only get 5% interest on a CD, but that with his special investment in the "TDA Advantage Trust" she would earn 6.15% with monthly payout of $512.50 (on her investment of $100,000.) and that this was a deal she should not refuse.

23. Ms. Gembitsky once again asked for more information about the special investment offered by defendants DeSteph and The DeSteph Agency. DeSteph acted as if she insulted him

6

and he abruptly left. The next day he called her and said that she should be very excited about the investment and that he could not understand how she could turn down such an opportunity. Ms. Gembitsky agreed to meet with him to discuss the matter further.

24. On or about January 13, 2003 (prior to the trip to Disney World), DeSteph came to the plaintiff's residence in Connecticut. He made certain representations and promises to the plaintiff as an inducement for her to invest her money through him and his agency. Among other representations, DeSteph promised an interest rate of 6.15% and monthly payments of $512.50. DeSteph provided no prospectus, literature, or other documentation concerning how the funds would specifically be invested.

25. On a hand-written note regarding CD rates, DeSteph wrote the words "limited partnership." When Ms. Gembitsky asked for explanation, DeSteph stated that it was "self-explanatory" and that it was how funds like that usually work in that Ms. Gembitsky would be investing into the fund but was limited in authority with the fund's investments. A copy of the note is attached to the Complaint in this matter as Exhibit A.

26. On or about January 13, 2003, the Ms. Gembitsky gave Mr. DeSteph a check for $100,000. A copy of the check is attached to the Complaint in this matter as Exhibit B. DeSteph told the plaintiff he would give her a "promissory note" in return.

27. Defendant DeSteph subsequently deposited the check into the "TDA Advantage Trust" account at Granite Bank in Keene, NH. As noted above, on information and belief, TDA Advantage Trust is one of defendant DeSteph's alter egos.[1]

---

[1]It appears likely that "TDA" is an acronym for The DeSteph Agency.

7

28. Ms. Gembitsky contacted DeSteph a few days after giving him the money seeking documentation. When she received none, she told DeSteph that she wanted her money back. DeSteph told her that it was too late and that she would have to wait five years.

29. Ms. Gembitsky continued to request documentation from DeSteph concerning her investment. She agreed to meet with DeSteph at a diner in Connecticut. At this time he presented her with a document entitled "Promissory Note," which he had signed in Peterborough, New Hampshire on March 10, 2003. A copy of said document is attached to the Complaint in this matter as Exhibit C.

30. Pursuant to the terms of this document, "TDA Advantage Trust" promised to (a) pay $412.50 per month (not the $512 previously promised), less a $12 "service charge" for five years; (b) pay a "prorated share" of the Trust's profits over that five year period; and (c) return the original principal plus all profits due on or before January 10, 2008.

31. Ms. Gembitsky did not receive *any* of the promised monthly payments. In April, 2003 she asked DeSteph for the money back and he informed her that the "promissory note" would be followed "to the letter." He also stated that the monthly payments were "reinvested" in the TDA Advantage Trust which was "routine." Ms. Gembitsky consulted an accountant who stated that it is sometimes a routine practice to reinvest profits.

32. Ms. Gembitsky also asked DeSteph whether she would receive statements or further documentation prior to being paid the $100,000 plus profits in January, 2008. DeSteph responded by saying that (a) she would not receive any additional paperwork with this investment; (b) he would be happy for the five-year period to be over so that he could be finished with her once and for all; and (c) she was a "pest" to him, or similar words to that effect.

8

33. At all times Ms. Gembitsky kept DeSteph informed as to her current address and contact information.

34. Ms. Gembitsky did not receive any payment from DeSteph, The DeSteph Agency, or the TDA Advantage Trust on, before or after January 10, 2008.

35. After January 10, 2008, Ms. Gembitsky made many efforts to contact DeSteph both via e-mail and telephone messages about the fact that she never received any of the promised funds.

36. Ms. Gembitsky was finally able to reach DeSteph on the telephone in July 2008. He told her that he "knew this day would come and that he had "dreaded it." DeSteph told her hat there was no money. DeSteph the informed her that he felt "morally obligated" to pay her the money, but that he would "file bankruptcy" if she got an attorney or otherwise attempted to collect the money from him. DeSteph also told the plaintiff that he had a "steady stream" of income and that she would start receiving payments from him. He told her that if she did not get an attorney he would work out a payment plan.

37. Ms. Gembitsky did not receive any payment from DeSteph thereafter. The plaintiff has had no contact with DeSteph since July 2008.

38. The Complaint in this case seeks compensatory damages as well as (a) punitive damages (pursuant to the Connecticut Unfair Trade Practices Act and the Section 10(b) of the Federal Securities Exchange Act of 1934), (b) enhanced compensatory damages under New Hampshire state common law; (c) attorneys fees (under both the Connecticut Unfair Trade Practices Act and New Hampshire common law); (d) costs and (e) interest. Had the defendants paid her, as they promised, she would have received more than $133,000. Given the facts of this case, it is not unreasonable to believe that (a) she will recover punitive and/or enhanced damages

9

in excess of this amount and (b) she will recover attorneys fees as well. Therefore, Ms. Gembitsky has demonstrated a likelihood of recovering at least $250,000.

39. Information About The Trustee Defendant: In 2003, defendants deposited plaintiffs' $100,000 check into a TDA Advantage Trust account at the Granite Bank in New Hampshire. Peoples United Bank d/b/a Ocean Bank is the success to the Granite Bank. There is, therefore, some likelihood that one or more of the defendants maintains an account at Peoples United Bank.

**B. The Plaintiff/Petitioner asserts that an *ex parte* attachment without prior notice is justified on the following grounds:**

1. There is substantial danger the property sought to be attached will be damaged, destroyed, or removed from the state and placed beyond the attachment jurisdiction of the court. See, RSA 511-A:8 (which is applicable to this motion by virtue of Fed. R. Civ. P. 64(a)). There are also other compelling exceptional circumstances which require the court to consider this motion on an *ex parte* basis. Id.

2. The facts set forth above demonstrate that the defendants engaged in an outrageous and sophisticated scheme to (a) obtain control over plaintiff's money; (b) lull plaintiff into the false belief that her money was invested; and (c) further lull plaintiff into the false belief that she would be repaid with interest. When it was no longer possible to continue this charade, in July 2008, defendants told plaintiff that they would pay her something (which they have not done) but only if she did not retain counsel. Although their threat was to file for bankruptcy, the defendants' entire course of dealings with the plaintiff suggests that they will go to great lengths to avoid ever paying her one penny.

3. The defendants purport to have specialized knowledge of the financial markets. They claim to be financial planners who are intimately familiar with all manner of investment

10

vehicles.  There is no question but that they have the ability to transfer, pledge, hypothecate and otherwise place the equity in their assets beyond the grasp of the plaintiff in this case.  Providing them with notice of this motion would allow them the opportunity to mortgage their real estate and transfer their bank accounts to other individuals, entities or locations.

Being duly sworn, I state under oath and subject to the pains and penalties of perjury, that all of the facts set forth above are true to the best of my knowledge, information and belief.

April 22, 2009                              /s/ Nancy Gembitsky
                                           Nancy Gebitsky


Personally appeared the person signing the above petition and certification, and swore that it was true to the best of his/her knowledge and belief.

Dated: April 22, 2009                      /s/Brian Greenwood
                                           Notary Public
                                           Brian Greenwood
                                           Notary Public, State of New York
                                           No. 02GR8108967
                                           Qualified in Suffolk County
                                           My Commission Expires April 10, 2010

11

vehicles. There is no question but that they have the ability to transfer, pledge, hypothecate and otherwise place the equity in their assets beyond the grasp of the plaintiff in this case. Providing them with notice of this motion would allow them the opportunity to mortgage their real estate and transfer their bank accounts to other individuals, entities or locations.

Being duly sworn, I state under oath and subject to the pains and penalties of perjury, that all of the facts set forth above are true to the best of my knowledge, information and belief.

Nancy Gembitsky

Personally appeared the person signing the above petition and certification, and swore that it was true to the best of his/her knowledge and belief.

Dated: April, 21, 2009

Notary BRIAN GREENWOOD
Notary Public - State of New York
No. 02GR6108867
Qualified in Suffolk County
My Commission Expires April 16, 2010

11

Respectfully submitted,

Nancy Gembitsky

By Her Attorneys,

GETMAN, STACEY,
SCHULTHESS & STEERE, P.A.

Dated:  April 22, 2009

/s/ Andrew R. Schulman
Andrew Schulman, Esq.
Three Executive Park Drive, Suite 9
Bedford, New Hampshire 03110
603/634-4300

12

## ORDER

The plaintiff is/is not granted permission to make the following attachment(s) and shall complete service on the defendant(s) within thirty (30) days: real estate in Cheshire county, bank accounts in Peoples United Bank d/b/a Ocean Bank and personal property set forth in the petition to attach.

Dated: April 27, 2009                    James E Muirhead
                                         Presiding Justice

* * * *

## NOTICE TO THE DEFENDANTS

The court has authorized the above attachment *to secure any judgment or decree* that the Plaintiff/Petitioner may obtain. You have the right to object in writing, ask for a hearing and request that the attachment be removed. Any objection to this attachment shall be filed in writing within 14 days after service of this notice on you. *If you fail* to file such a request within the time *specified* in the order, you will be deemed to have waived your right to a hearing with reference to the attachment, but not with reference to the merits of the Plaintiff/Petitioner's claim.

Date: 4/27/09                    James R Stern
                                 Presiding Justice or Clerk

13